United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL JURICICH,

        Plaintiff,

    v.

COUNTY OF SAN MATEO, et al.,

        Defendants.

Case No. 19-cv-06413-WHO

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. Nos. 65, 69

Plaintiff Michael Juricich brings claims arising out of a police encounter that occurred in San Carlos, California on December 1, 2018. He seeks to hold the County of San Mateo ("County"), the County of San Mateo Sheriff's Office ("Sheriff's Office"), and individual deputies David Brandt, Lisandro Lopez, and Michael H. Koehler liable for allegedly injuring him and violating his civil rights. Before me are defendants' motion for summary judgment on all claims and Juricich's motion for partial summary judgment on the objective reasonableness of the deputies' conduct under the Fourth Amendment.

For the reasons set forth below, defendants' motion for summary judgment is GRANTED on Juricich's 42 U.S.C. section 1983 claim as well as all related state law claims and the Americans with Disabilities Act ("ADA") claim involving the arrest because they were entitled to perform a *Terry* stop, the force used to stop Juricich was not excessive, and they did not realize that Juricich had a colostomy bag until after his arrest. Juricich's motion for partial summary judgment is DENIED. And, at a minimum, they would be entitled to qualified immunity for Juricich's 42 U.S.C. § 1983 claim. However, there is a dispute of facts material to whether defendants were told that there was an issue with his colostomy bag after the arrest. For that

United States District Court
Northern District of California

1  reason, summary judgment is denied with respect to his post-arrest ADA claim.

2                                    **BACKGROUND**

3  **I.      FACTUAL BACKGROUND**

4          There are two dash-cam videos that disclose much of evidence in this case: one from

5  Brandt's patrol vehicle and the other from Lopez.[1]  The parties largely agree on the facts, but their

6  versions of the events differ in some respects.  The major disagreements are whether Juricich

7  appeared agitated during his encounters with Brandt, Koehler and Lopez, which is not a material

8  dispute, and what happened to Juricich and his colostomy bag after arrest, which is.[2]

9          **A.      Brandt Conducts a Traffic Stop**

10         The underlying events occurred on December 1, 2018.  At approximately 4:00 p.m.,

11  Michelle Gore, Juricich's domestic partner for eight years, executed an illegal U-turn in front of

12  Brandt's patrol vehicle.  She did so after seeing Juricich walking on the sidewalk.  Declaration of

13  Peter H. Cruz in Support of Defendants' Motion for Summary Judgment ("Cruz Decl.") [Dkt. No.

14  65-1], Ex. G (Gore Dep.) at 71:15–18.  Brandt initiated a traffic stop; he turned on his lights and

15  followed her vehicle until she pulled over.  *Id.*, Ex. A (Brandt Dep.) at 77:25–78:18; *id.*, Ex. B

16  (Brandt Dash-Cam Footage) at 00:1–44.

17          Brandt began providing Gore with instructions via his patrol vehicle loudspeaker to

18  proceed further northbound on El Camino Real/State Route 82 ("SR-82") near Brittan Avenue and

19  pull over where it was safe because she stopped in the number two lane of traffic.  Brandt Dash-

20

---

21  [1] Jeff Martin, defendants' retained police practices expert, created seven video clips that are in
22  essence the same raw footage that has been in the possession of both parties, but with added
   proprietary time-stamps to the footage for ease of reference for his expert analysis.  Declaration of
23  Shantha Ranganathan in Support of Defendants' Motion for Summary Judgment ("Ranganathan
   Decl.") [Dkt. No. 91] ¶ 5.  Defense counsel shared these clips with plaintiff's counsel.  *Id.* ¶¶ 6–7.
24  Juricich objects to use of the video clips on grounds that he has not been able to view what Martin
   created in time to respond in his opposition papers.  *See* Declaration of David M. Helbraun in
25  Support of Opposition to Defendants' Motion for Summary Judgment ("Helbraun Decl.") [Dkt.
   No. 87-1] ¶ 18.  He requests that only the relevant dash-cam videos be viewed by the court rather
26  than as "excerpted" by defendants.  *Id.* ¶ 20.  None of Martin's video clips were submitted in
   support of defendants' motion for summary judgment.  Ranganathan Decl. ¶ 6.  Juricich's
27  objection is overruled as moot.

28  [2] For purposes of this Order, I will assume Juricich's version of his temperament at the scene is
   correct unless otherwise noted.

Cam Footage at 0:44–0:48.  She did so.  But before Brandt brought his patrol vehicle to a complete stop, Juricich crossed from the unpaved sidewalk in front of the moving patrol vehicle and approached Brandt's driver's side door.   A startled Brandt said, "Hey!" toward Juricich.  *Id.* at 00:45–00:48.

Brandt testified that he heard Juricich say "cite her, cite her" as Brandt was still bringing his patrol vehicle to a stop.  Brandt Dep. at 87:1–15.  Juricich does not dispute that he said those words; he does dispute the manner in which he said them.  *See* Helbraun Decl., Ex. F (Juricich Dep.) at 137:22–24; *id.*, Ex. J (Gore Dep.) at 73:18–19.

Brandt exited his patrol vehicle as Juricich approached and instructed Juricich to return to the sidewalk.  Juricich did not immediately comply.  Brandt Dash-Cam Footage at 00:50–54.  At this point, Juricich was face-to-face with Brandt, who was standing outside the driver side of the patrol car.  Juricich can be distinctly heard to say ". . . cheating on me."  *Id.* at 00:52–00:54.  Brandt then touched Juricich to get him to move back to sidewalk.  Juricich yelled, "Don't fucking touch me!"  *Id.* at 00:55–1:00; Brandt Dep. at 99:01–04, 101:19–102:04; Juricich Dep at 139:4–5.

Juricich then returned to the sidewalk.  Brandt Dash-Cam Footage at 1:00–1:04.  Brandt, who was the only officer present at the scene, radioed for assistance "due to a possible domestic" at approximately 4:03p.m.  He had not yet spoken to Gore.  *Id.* at 1:04–1:05; Cruz Decl., Ex. H (CAD Communications) at CSM 000016.  Upon reaching the unpaved sidewalk on the right shoulder, Juricich started walking northbound on SR-82, turned around to say something in Brandt's direction, and then continued walking away.  Brandt Dash-Cam Footage at 1:05–1:15.  Brandt added "verbal for now" to the radio dispatcher.  *Id.* at 1:14–1:15.

**B.    Lopez and Koehler Arrest Juricich**

Lopez and Koehler responded to Brandt's call.  Lopez saw Juricich walking down the right shoulder of SR-82 and radioed to dispatch that he had made contact with Juricich at approximately 4:07 p.m.  CAD Communications at CSM 000017.  Staying in his vehicle, Lopez followed Juricich on the right shoulder of SR-82.  Cruz Decl., Ex. C (Lopez Dash-Cam Footage) at 00:45–00:55.  When Koehler pulled his marked patrol car approximately fifteen to twenty feet in front of where Juricich was walking, *id.* at 00:55–1:00, Lopez used his wail siren three separate

United States District Court
Northern District of California

United States District Court
Northern District of California

1   times right behind Juricich and parked.  Lopez Dash-Cam Footage at 00:54–00:58.  Juricich did

2   not react to the wail siren and continued walking northbound on the SR-82 shoulder toward

3   Koehler's now-parked patrol vehicle.  *Id.* at 0:58–1:04.  Koehler exited his patrol vehicle from the

4   driver's seat and walked toward rear of his vehicle to intercept Juricich.  *Id.*

5       Koehler put his right hand out as he walked toward Juricich.  Juricich did not stop and

6   continued to walk northbound on SR-82.  Lopez Dash-Cam Footage at 1:00–1:04.  As Juricich

7   continued to walk, Koehler grabbed Juricich's left arm; Juricich pulled his arm away.  *Id.* at 1:04–

8   1:06.  Koehler then grabbed Juricich around the back of his neck and tried to take him down to the

9   ground.  Once he got Juricich onto the ground, Koehler put Juricich in an arm bar control hold and

10  placed him in handcuffs.  *Id.* at 1:06–1:24.  Lopez exited his patrol vehicle to assist Koehler in

11  bringing Juricich into custody.  *Id.* at 1:07–1:24.  Juricich was placed under arrest for violating

12  California Penal Code section 148(a)(1).  Cruz Decl., Ex. I (Misdemeanor Report) at CSM

13  000008, 000013.

14      **C.      Post-Arrest**

15      Juricich has a colostomy bag.  It was under his clothes and not visible prior to and at the

16  time of arrest.  *See* Lopez Dash-Cam Footage at 0:46–2:12.  Once Juricich was in handcuffs on the

17  side of the road, Lopez conducted a pat-down search to make sure Juricich did not have any

18  weapons.  *Id.* at 2:12–2:44.  At that point,  Lopez learned of Juricich's colostomy bag.  Cruz Decl.,

19  Ex. E (Lopez Dep.) at 186:04–15; 187:06–22.

20      Juricich asserts that the deputies, and later jail personnel, denied his request to adjust his

21  colostomy bag.  Defendants contend that Juricich made no complaints about it.  Juricich testifies

22  that it was not until he was placed in his cell, with others, that he was unhandcuffed and able to

23  examine the damage caused by Koehler's take down and try to re-attach his colostomy bag.  He

24  had to do this in front of others, exposing his abdomen and stoma.  Juricich Dep. at 180:18–

25  181:15.  He claims that the colostomy bag was damaged during his arrest and would not stay

26  attached if he sat down.  As a result, he had to remain standing in the cell for approximately eight

27  hours until he was released around 2:00 a.m.  *Id.*

28

## II.     PROCEDURAL BACKGROUND

Jurich asserts the following causes of action in the Second Amended Complaint ("SAC"): (i) section 1983 against Brandt, Koehler, and Lopez[3]; (ii) violation of California Civil Code section 52.1 against all defendants; (iii) negligence against all defendants; (iv) assault against Lopez and Koehler; (v) battery against Lopez and Koehler; and (vi) ADA against all defendants. SAC ¶¶ 40–76. Defendants moved for summary judgment and Jurich moved for partial summary judgment on the objective reasonableness of Brandt, Lopez, and Koehler's conduct under the Fourth Amendment. Defendants' Motion for Summary Judgment ("Defs MSJ") [Dkt. No. 65]; Plaintiff's Motion for Partial Summary Judgment ("Jurich Partial MSJ") [Dkt. No. 69]. I heard argument on January 13, 2021.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

---

[3] Jurich brings his section 1983 claim under the First, Fourth and Fourteenth Amendments on grounds that he "was wrongfully and without proper cause detained, arrested, and subjected to unreasonable and excessive force, and was deprived of needed medical care while in the care, custody or control of Defendants." SAC ¶ 41. The briefing before me does not address the alleged First Amendment violation and it does not appear to have merit. Moreover, the bare-bone First Amendment allegation was not part of Jurich's section 1983 claim in the original Complaint, and he did not seek leave before inserting it into his First Amendment Complaint and later into the operative SAC. *See* Complaint [Dkt. No. 1] ¶ 33; Order Granting Motion to Dismiss with Leave to Amend [Dkt. No. 22] 10 (granting defendants' partial motion to dismiss the Complaint and allowing leave to amend the negligence, *Monell*, and ADA claims); Minute Entry for Case Management Conference Held on March 10, 2020 [Dkt. No. 26] (granting leave to file a SAC upon agreement of the parties).

United States District Court
Northern District of California

United States District Court
Northern District of California

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

## I.   SECTION 1983 CLAIM

Juricich asserts his section 1983 claim against Brandt, Koehler, and Lopez on grounds that he was "wrongfully and without proper cause detained, arrested, and subjected to unreasonable and excessive force, and was deprived of needed medical care while in the care, custody or control of Defendants." SAC ¶ 41. The claim fails, and qualified immunity would apply even if it had merit.

### A.   Unlawful Detention or Arrest

The Fourth Amendment allows officers to conduct a brief investigatory stop if there is a reasonable, articulable suspicion supporting the action. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). A police officer may seize a person if the officer had a reasonable suspicion supported by articulable facts that "criminal activity may be afoot," even if the officer lacks probable cause. *Id.* at 30. "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective reasonable inferences, form a basis for particularized suspicion." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Montero–Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000). However, reasonable suspicion does not require that the crime already be committed; a *Terry* stop is justified by reasonable suspicion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30.

Juricich contends that Brandt lacked articulable reasonable suspicion to detain based solely on their interaction. Juricich Partial MSJ 9–10; Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Juricich Oppo.") [Dkt. No. 87] 20. Brandt had not spoken yet to Gore. Juricich argues that Brandt's "verbal for now" statement to the dispatcher indicates that he did not

have a reasonable basis upon which to infer that a domestic violence crime had occurred, since California Penal Code sections 273.5 and 243(e)(1) necessarily require some offensive touching to have occurred for the crime to have been committed.  Juricich Partial MSJ 12.[4]

Juricich cites several cases in support of his contention that more was needed for reasonable suspicion in this case.  Juricich Partial MSJ 13–15; *see Thomas v. Dillard*, 818 F.3d 864, 875 (9th Cir. 2016) (reasonable suspicion to detain established by someone who claimed to have witnesses a physical confrontation); *United States v. Harris*, 642 Fed. Appx. 713 (9th Cir. 2016) (officer investigated a possible domestic violence crime based on a third party 911 call); *United States v. Delano*, 348 Fed. Appx. 258, 259 (9th Cir. 2009) (officer received information about a reported domestic violence incident, which justified a "brief investigative detention"); *United States v. Browne*, 233 F. Supp. 3d 814, 822 (C.D. Cal. 2017) (reasonable suspicion established by caller who identified her ex-boyfriend and said he was at her back door threatening her with a gun).  Unlike the situations in those cases, Juricich contends that there was never any call from anyone claiming they had heard or seen a possible domestic violence situation between him and Gore.

That is true.  But while Juricich's cited cases all involved some form of third-party call claiming that they had heard or seen a possible domestic violence situation, which in turn informed the officer's reasonable suspicion, that does not mean that reasonable suspicion is necessarily lacking absent such circumstances.  The Supreme Court requires, "we must consider the totality of circumstances – the whole picture."  *Sokolow*, 490 U.S. at 8–9.  Considering the totality of circumstances here, as depicted in Brandt's dash-cam video, Brandt had sufficient reasonable suspicion to conduct a *Terry* stop to investigate for suspected domestic violence.

---

[4] Juricich also relies on Brandt's response to a single question posed in his deposition.  *See* Brandt Dep. at 105:14–18 ("Was there anything at all about the interaction between you and [Juricich] at all during that time period that led you to believe that he had possibly committed a crime?"; Brandt responded "No.").  But Brandt's subjective answer is not what controls here.  The focus belongs on the objective facts and whether they meet the applicable standard of objectively reasonable suspicion.  *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent.  [E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.") (citations omitted).

1    Consider the totality of the circumstances.  As Brandt was conducting the traffic stop, a

2   pedestrian who would not normally be involved in a motor vehicle traffic stop (Juricich) walked in

3   front of a still moving patrol car to the driver's side next to traffic on a busy road, repeatedly states

4   "cite her," fails to quickly comply with Brandt's order to get back on the sidewalk, tells Brandt

5   that the driver of the pulled over car was "cheating on me," and responds angrily when Brandt

6   touched him to get him to move back to the sidewalk.  Those objective facts would lead a trained,

7   reasonable officer to be concerned that there was some sort of domestic dispute or activity

8   occurring that may be related to the crime of domestic violence, that Juricich was involved in that

9   activity, and that the matter should be investigated.  The video evidence demonstrates that Brandt

10   had reasonable suspicion to conduct a *Terry* stop to investigate a potential domestic violence issue.

11    Moreover, Brandt had probable cause to arrest Juricich for violating California Penal Code

12   section 148(a)(1).  The legal elements of a Penal Code section 148(a)(1) crime include: "(1) the

13   defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was

14   engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should

15   have known that the other person was a peace officer engaged in the performance of his or her

16   duties." *Yount v. City of Sacramento*, 43 Cal.4th 885, 894–95 (2008), *cert. denied*, 555 U.S. 1099

17   (2009) (citation and internal quotations omitted).  "Probable cause does not require proof beyond a

18   reasonable doubt of every element of a crime.  Rather, probable cause exists where under the

19   totality of the circumstances known to the officer, a prudent person would have concluded that

20   there was a fair probability that the suspect had committed or was committing a crime." *United*

21   *States v. Noster*, 590 F.3d 624, 629–30 (9th Cir. 2009) (citation omitted).

22    The objective facts support probable cause.  Juricich walked in front of Brandt's marked

23   patrol vehicle and forced Brandt to interact with him, obstructing and delaying the traffic stop

24   Brandt had just initiated against Gore.  Brandt Dash-Cam Footage at 0:43–1:15.  While Juricich

25   claims that he was "coincidentally" crossing SR-82 at Brittan Avenue, trying to get to the

26   crosswalk, and walked in front of  Brandt's patrol car to access the crosswalk at Brittan Avenue,

27   Juricich Dep. at 135:10–22; Declaration of Michael Juricich in Support of Opposition to

28   Defendants' Motion for Summary Judgment ("Juricich Decl.") [Dkt. No. 87-3] ¶ 6, the video

United States District Court
Northern District of California

8

1   evidence belies that assertion.

2       The video initially shows Juricich walking westbound on the sidewalk of Brittan Avenue,

3   toward the crosswalk, but then he turns right to walk northbound on SR-82, away from the

4   crosswalk.  Brandt Dash-Cam Footage at 00:28–00:34.  Gore's vehicle travelled at least three car

5   lengths northbound on SR-82 past the crosswalk before she stopped.  *Id.* at 00:31–00:35.  Brandt

6   pulled up behind her.  If Juricich decided to reverse course and go back to the crosswalk, Brandt's

7   patrol car would not have been blocking his path.  Given Juricich's physical and verbal conduct,

8   no reasonable jury would believe that Juricich was simply trying to access the crosswalk when he

9   crossed in front of Brandt's patrol car.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When

10   opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

11   that no reasonable jury could believe it, a court should not adopt that version of the facts for

12   purposes of ruling on a motion for summary judgment.").  And even if Juricich was trying to cross

13   the street, that does not defeat the objective reasonableness of Brandt's suspicion.  *See Reid v.*

14   *Georgia*, 448 U.S. 438, 441 (1980) (recognizing that "there could, of course, be circumstances in

15   which wholly lawful conduct might justify the suspicion that criminal activity was afoot");

16   *Sokolow*, 490 U.S. at 8–9 ("*Terry* itself involved 'a series of acts, each of them perhaps innocent'

17   if viewed separately, 'but which taken together warranted further investigation.'") (quoting *Terry*,

18   392 U.S. at 22).

19       Considering the totality of the circumstances as depicted in  Brandt's dash-cam video and

20   construing all disputed facts in the light most favorable to Juricich, with justifiable inferences in

21   his favor, Brandt had reasonable suspicion to conduct a *Terry* stop for suspected domestic violence

22   and probable cause to arrest for obstructing and delaying his traffic stop.

23        Koehler and Lopez responded to Brandt's call for assistance.  They were entitled to rely

24   on the information received from Brandt as a basis for detaining Juricich for a *Terry* stop.  *See*

25   *United States v. Ramirez*, 473 F.3d 1026, 1033 (9th Cir. 2007) (the collective knowledge doctrine

26   applies when "an officer (or team of officers), with direct personal knowledge of all the facts

27   necessary to give rise to reasonable suspicion or probable cause, directs or requests that another

28   officer, not previously involved in the investigation, conduct a stop, search, or arrest").

United States District Court
Northern District of California

1    Defendants' motion for summary judgment on this portion of Juricich's section 1983 claim

2    is GRANTED.

3    **B.    Handcuffing**

4    Juricich seeks partial summary judgment that Koehler lacked reasonable suspicion to

5    attempt to handcuff him or to use force to do so.  Juricich Partial MSJ 16.  He argues that

6    Koehler's effort to handcuff him was without justification because "[u]nder ordinary

7    circumstances, when the police have only reasonable suspicion to make an investigatory stop,

8    drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment."

9    *Green v. City and County of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014) (citing

10   *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996)); *United States v. Bautista*, 684 F.2d

11   1286, 1289 (9th Cir. 1982); *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990)

12   ("[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory

13   detention and is not part of a typical *Terry* stop.").

14   Juricich's argument ignores the sequence of events that occurred that day:  (1) Juricich's

15   encounter with Brandt created objective reasonable suspicion to do a *Terry* stop to investigate for

16   domestic violence; (2) that same behavior violated Penal Code section 148(a)(1) and gave Brandt

17   the right to arrest Juricich; (3) Brandt directed  Koehler and Lopez to conduct a *Terry* stop on

18   Juricich; (4) Koehler and Lopez attempted to do so, but Juricich ignored their commands to stop,

19   which violated Penal Code section 148(a)(1) in their presence and independently vested them with

20   the right to arrest him for that offense; and (5) Juricich was then handcuffed and arrested for

21   violating Penal Code section 148(a)(1).[5]

22   The evidence shows that Juricich refused to stop walking despite multiple commands from

23   two marked patrol vehicles and a uniformed officer.  Lopez turned on his emergency lights and, as

24   Juricich continued walking, sounded the "wail siren" three separate times.  Lopez Dash-Cam

25   _____

26   [5] Defendants add that Juricich physically resisted Koehler's attempt to detain him when Koehler
     grabbed his arm, continuing to violate Penal Code section 148.  Juricich argues that his "reactive,

27   instinctive movement" in response to Koehler's arm grab cannot constitute physical resistance and
     form a basis for a Penal Code section 148 violation.  *Dillard*, 818 F.3d at 885.  Even without

28   Juricich's "reactive, instinctive movement," there was enough that happened before Koehler's arm
     grab to vest Koehler with the right to arrest.

United States District Court
Northern District of California

Footage at 0:54–0:58.  Juricich continued walking without acknowledging Lopez.  *Id.*  Koehler drove past Lopez and Juricich and brought his marked patrol vehicle to a stop ahead of and in front of Juricich.  *Id.* at 00:55–1:00.  Juricich was sandwiched by Lopez's patrol vehicle that sounded its siren to the rear and Koehler's suddenly pulling in front of him, clearly communicating their intent that he stop.  But Juricich continued walking.

Koehler immediately exited his patrol vehicle and instructed Juricich to stop.  Lopez Dash-Cam Footage at 0:59–1:04.  Although Juricich disputes what Koehler said to him, the dash-cam video clearly depicts Koehler putting his hand out, gesturing Juricich to stop.  *Id.*  When Juricich ignored Koehler's commands to stop, Koehler grabbed his arm to arrest him for resisting, obstructing, and delaying the performance of the *Terry* stop to investigate involvement in possible domestic violence.[6]

Juricich was handcuffed during the process of being arrested for his failure to comply with commands and interfering with the officers' discharge of their duties.  If he had simply stopped after hearing the wail sirens behind him or seeing Koelhler's gesture in front of him, as a reasonable person would have done, he would not have been handcuffed.  Contrary to Juricich's argument, he was not handcuffed during a *Terry* stop for suspected domestic violence; he was handcuffed in the process of being arrested for obstructing a lawful *Terry* stop in violation of Penal Code section 148(a)(1).

The real question here is whether Koehler and Lopez had probable cause to arrest Juricich for violating Penal Code section 148(a)(1).  In *People v. Allen*, 109 Cal. App. 3d 981, 987 (1980), the California Court of Appeal held that a defendant violates Penal Code section 148 when he flees with "the clear knowledge that the officer wanted to detain and talk with him."  The defendant in that case violated section 148 because the officer possessed reasonable suspicion that the defendant was involved in criminal activity and defendant fled when the officer tried to arrest him.  "The rule of *Allen* has therefore been succinctly summarized as follows: Flight from an

---

[6] The parties also dispute whether Juricich "altered his path" toward Koehler.  The dash-cam video does not clearly show one way or another.  But even accepting Juricich's contention that he did not alter his path toward Koehler, the video shows that he did not comply with Koehler and Lopez's undisputable commands to stop him.

United States District Court
Northern District of California

officer attempting to effect a *lawful* detention can constitute resisting or delaying a peace officer, provided the person fleeing knows the officer wishes to detain him." *United States v. Conerly*, 75 F. Supp. 3d 1154, 1162 (N.D. Cal. 2014) (internal quotation marks and citation omitted).

Here, Koehler and Lopez were attempting to effect a lawful detention of Juricich. As discussed above, Brandt had reasonable suspicion to conduct a *Terry* stop to investigate Juricich's involvement in possible domestic violence and Koehler and Lopez were entitled to rely on that reasonable suspicion when they confronted Juricich down the street. Once Juricich refused to comply with Koehler and Lopez's attempt to conduct a lawful *Terry* stop, they then had the probable cause to arrest him for resisting, obstructing, or delaying the investigation under Penal Code section 148(a)(1).

Juricich argues that these events–his failure to immediately respond to Lopez's siren or to move quickly to respond to Koehler's cutting him off and gesturing him to stop as soon as he exited the vehicle–took place in a matter of seconds as he continued to walk down the street. He cites two cases to argue in support of his argument that this cannot amount to probable cause to arrest for Penal Code section 148. Plaintiff's Reply in Support of Motion for Partial Summary Judgment ("Juricich Reply") [Dkt. No. 92] 8–10; *see* Lopez Dash-Cam Footage 00:55–1:05.

In *People v. Quiroga*, 16 Cal. App. 4th 961, 964 (1993), the California Court of Appeal held that the defendant did not violate Penal Code section 148 where the officer ordered the defendant to "put his hands on his lap" and defendant "was 'very uncooperative' but 'finally' obeyed the order." The circumstances here are distinguishable because Juricich never obeyed the order to stop. Unlike in *Quiroga*, where the conduct was a short delay in responding to a directive from a police officer, Juricich refused to stop and continued walking despite three wail sirens from Lopez's patrol car, Koehler's patrol car cutting him off, and Koehler commanding him (by action if not by words) to stop. *See Bennett-Martin v. Plasencia*, 804 F. App'x 560, 562 (9th Cir. 2020) (distinguishing *Quiroga* where officer "could have believed that the situation he encountered was less like the situation in *Quiroga* and more like the situations officers encountered in *Young v. County of Los Angeles*, 655 F.3d 1156, 1169–70 (9th Cir. 2011), and *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1330 (2002), where the arrestees did not comply with officers' commands and the

12

United States District Court
Northern District of California

1    courts held that there was probable cause to arrest based on section 148(a)(1)").

2          Juricich's reliance on *Mackinney v. Nielsen*, 69 F.3d 1002 (9th Cir. 1995) is similarly

3    misplaced.  In *Mackinney*, the district court held that officers who yelled to Mackinney to stop

4    writing on the sidewalk possessed the requisite probable cause to arrest him for Penal Code

5    section 148 when he refused to stop defacing the sidewalk.  *Id.* at 1006.  The Ninth Circuit

6    reversed, finding that "when he was ordered to stop writing on the sidewalk, Mackinney refused to

7    comply for only a few seconds."  *Id.*  "Of course, people must obey the police in most situations.

8    But here, the police overreacted to Mackinney's momentary disobedience."  *Id.* Juricich

9    emphasizes the "few seconds" in *Mackinney* and the approximately ten seconds that lapsed

10   between the three wail sirens from Lopez's patrol car, Koehler's patrol car cutting Juricich's

11   walking path, and Koehler exiting his patrol car and ordering Juricich to stop.  Lopez Dash-Cam

12   Footage at 00:55–1:05.  He complains that there was never any effort by Koehler to converse with

13   him, as *Terry* would have permitted him to do.  Juricich Reply 9.

14         The "few seconds" that passed in *Mackinney* was not the only reason why the Ninth

15   Circuit concluded that "[a] reasonable person would not have thought that Mackinney was

16   obstructing the officers by not immediately putting down his chalk" 69 F.3d at 1006.  The Ninth

17   Circuit noted that "[n]o reasonable officer could have thought that he or she had probable cause to

18   arrest Mackinney when it was apparent that Mackinney probably did not realize that the order he

19   was failing to obey came from the police" as the order came from an unmarked police car.  *Id.*  It

20   also noted that "Mackinney did ultimately comply with the police order to stop writing," and that

21   "[a]ny reasonable officer would have known that they needed more than Mackinney's hesitation to

22   arrest him."  *Id.*  In contrast, Juricich knew the commands were coming from marked patrol cars

23   and uniformed officers.  He did not comply with the order to stop.

24         Juricich's focus on the ten-second window assumes that the interactions he had with

25   Brandt, Koehler and Lopez were isolated incidents.  Not so.  The totality of circumstances started

26   with Gore's illegal U-turn and includes the interaction Juricich had with Brandt only minutes

27   before Koehler and Lopez encountered him.

28         Juricich points out that Brandt did not order Juricich to stop walking away from the Gore

13

traffic stop and did not tell dispatch that there was probable cause to detain him for obstructing the Gore traffic stop in violation of Penal Code section 148. Instead, Brandt only said that he needed assistance for a "possible domestic" issue. CAD Communications at CSM 000016. But under the collective knowledge doctrine, when one officer directs another to take some action "there is necessarily a 'communication' between those officers, and they are necessarily functioning as a team." *Ramirez*, 473 F.3d at 1036. As a result, the commanding officer does not need to convey information regarding why the suspect should be seized, and the resulting arrest does not violate the Fourth Amendment. *Id.* (noting that "[i]t is well-established that when an order to stop or arrest a suspect is communicated to officers in the field, the underlying facts constituting probable cause or reasonable suspicion need not be communicated") (citation omitted). Moreover, Koehler's report notes that he "responded to a request for a cover officer needed in the area of El Camino Real and Brittan Avenue in the City of San Carlos" and that "Deputy Brandt (B-51) advised he was out with a possible domestic violence incident and *the male half was walking away from the scene.*" Cruz Decl., Ex. I (Misdemeanor Report) at CSM 000011 (emphasis added).

Given the totality of the circumstances, a reasonable officer could have thought that he had probable cause to arrest Juricich for violating Penal Code section 148. Juricich's partial motion for summary judgment on grounds that Koehler's attempt to handcuff him or to use force to do so was unjustified is DENIED.

## C. Excessive Force

Claims for excessive force are analyzed under the Fourth Amendment's prohibition against unreasonable seizures using the framework articulated in *Graham v. Connor*, 490 U.S. 386 (1989). The reasonableness of a seizure turns on "whether . . . officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," *id.* at 397, which the court determines by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396.

In conducting this inquiry, the court first assesses "the gravity of the particular intrusion on Fourth Amendment interests." *Young*, 655 F.3d at 1161 (quoting *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir.2003)). The court then looks to "the importance of the government interests at

1    stake," and finally balances "the gravity of the intrusion on the individual against the

2    government's need for that intrusion to determine whether it was constitutionally reasonable." *Id.*

3    (quoting *Miller*, 340 F.3d at 964).

4          The reasonableness of force used is ordinarily a question of fact for the jury. *Liston v. Cty.*

5    *of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997). "Because [the excessive force] inquiry is

6    inherently fact specific, the determination whether the force used to effect an arrest was reasonable

7    under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City &*

8    *Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks and citation

9    omitted); *see also Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) ("[W]e have held on

10   many occasions that summary judgment or judgment as a matter of law in excessive force cases

11   should be granted sparingly."); *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994) ("[W]hether a

12   particular use of force was reasonable is rarely determinable as a matter of law.").

13         But defendant officers "can still win on summary judgment if the district court concludes,

14   after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was

15   objectively reasonable under the circumstances." *Liston*, 120 F.3d at 976 n.10 (citation omitted);

16   *see, e.g.*, *M.M. v. Cty. of San Mateo*, No. 18-CV-05396-YGR, 2020 WL 109229, at *5 (N.D. Cal.

17   Jan. 9, 2020) (granting summary judgment on excessive force claim to defendants, where "[f]ew,

18   if any, material facts [were] disputed in [the] matter to require a jury to sift through to reach a

19   conclusion" and the court "construe[d] the record in the light most favorable to plaintiff, drawing

20   all inferences in favor of her where applicable"); *Hudlow v. Cty. of San Diego*, No. 18-CV-2826-

21   CAB-WVG, 2020 WL 2934965, at *6 (S.D. Cal. Jun. 3, 2020) ("Construing the facts in the light

22   most favorable to Plaintiff, there is no triable issue: Defendants' use of force was objectively

23   reasonable under the circumstances and did not violate the Fourth Amendment.").

24                    **1.    Nature and Quality of Intrusion**

25         I first assess the "quantum of force used to arrest [Juricich] by considering the type and

26   amount of force inflicted." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) (quotation

27   omitted). Koehler and Lopez used arm bar control holds and then pressure to place Juricich in

28   handcuffs when he failed to respond to their commands to stop. Lopez Dash-Cam Footage at

United States District Court
Northern District of California

1:04–1:33; *see* Cruz Decl., Ex. D (Koehler Dep.) at 139:20–140:22.

*Donovan v. Phillips*, No. 3:14-cv-00680-CRB, 2015 WL 993324 (N.D. Cal. Mar. 4, 2015), *affirmed*, 685 Fed. Appx. 611 (9th Cir. 2017) is instructive regarding the use of control holds. The officer there used a wrist control hold on plaintiff, a passenger who had exited a vehicle stopped for suspected driving under the influence. *Id.* at *1. The officer told plaintiff several times to stop and reenter the vehicle as he approached. *Id.* at *2. Plaintiff stopped and turned her body to the side with her hands raised slightly at her side. *Id.* Two seconds later, the officer reached plaintiff and put her in control hold in which he gripped and twisted her right wrist, causing plaintiff to twist "to avoid pain in her arm and wrist as Defendant applied pressure," and forced her to the ground. *Id.* The officer's actions caused plaintiff to sustain a sprained rotator cuff. *Id.*

The court held that the use of wrist control hold to effect compliance was a "minimal intrusion" on plaintiff's Fourth Amendment rights, noting that (a) the control hold is a "low level" of force, even though it involved application of pressure and pain; (b) the lack of evidence that the level of force "caused or was capable of causing grave physical injury", and (c) that plaintiff "had no legal right to disregard the officer's orders to reenter the vehicle." *Id.* at *5; *see also Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1097 (9th Cir. 2006) ("Faced with a potentially violent suspect, behaving erratically and resisting arrest, it was objectively reasonable for Smith to use a control hold to secure Fullard's arm long enough to place him in handcuffs."; "We have held more aggressive police conduct than Smith's objectively reasonable, even where the conduct resulted in serious physical injury.").

Juricich does not attempt to establish that the quantum of force used for the arrest was objectively unreasonable. Juricich Oppo.19; Juricich Partial MSJ 20–21. Instead, he argues that, unlike in *Donovan*, there was no legal justification to detain him in the first place based on lack of reasonable suspicion, so any use of force by Koehler was constitutionally unreasonable. This argument fails because, as set forth in above, Koehler had the right to detain Juricich based on the reasonable suspicion furnished by Brandt. Koehler also had independent probable cause to arrest Juricich because he violated Penal Code section 148(a)(1) in Koehler's presence. *See Muehler v.*

1   *Mena*, 544 U.S. 93, 99 (2005) ("[R]ight to make an arrest . . . necessarily carries with it the right to

2   use some degree of physical coercion or threat thereof to effect it.") (citation omitted).

3         Given that Juricich had no legal right under section 148(a)(1) to disregard Koehler and

4   Lopez's orders to stop, and that a low level of force was used to effect compliance, I find that the

5   intrusion on Juricich's Fourth Amendment interests was minimal under the circumstances.  When

6   viewed in the light most favorable to Juricich, this physical force was "among the lowest levels of

7   force peace officers are trained to use when a subject does not respond to verbal commands."

8   *Donovan*, 2015 WL 9933324, at \*5.

9              **2.**        **Government Interest at Stake**

10         Next, I evaluate the government's interest in the use of force by examining three core

11   factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to

12   the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or

13   attempting to evade arrest by flight.  *Graham*, 490 U.S. at 396; *see also Deorle v. Rutherford*, 272

14   F.3d 1272, 1280 (9th Cir. 2001); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  The

15   analysis "must embody allowance for the fact that police officers are often forced to make split-

16   second judgments–in circumstances that are tense, uncertain, and rapidly evolving."  *Graham*, 490

17   U.S. at 396–97.  "The reasonableness of a particular use of force must be judged from the

18   perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

19   *Id.* at 396.

20         The most important factor is whether Juricich presented an immediate threat to safety

21   when he was detained.  *Chew*, 27 F.3d at 1440.  Koehler's decision to arrest Juricich with

22   handcuffs was informed by the totality of the circumstances, including Brandt's request for

23   assistance, the location of the encounter with Juricich occurring on a busy state highway, and

24   Juricich's failure to comply with an officer's command to stop. The officers knew that this was a

25   "possible domestic," meaning that its severity might or might not be significant.  But they were at

26   the side of a busy road where the officers had to be concerned about the safety of motorists as well

27   as their own safety and that of Juricich.  Indeed, the video evidence shows that during the struggle

28   with Juricich, Koehler's leg came within several inches to a foot of the traffic lane, with several

United States District Court
Northern District of California

cars passing by the scene.  Lopez Dash-Cam Footage at 1:00–1:37.

The parties dispute whether Juricich was actively resisting when he was placed in a control hold by Koehler, and when this active resistance started.  Assuming he did not actively resist, however, "[p]assive resistance alone can support some level of government force if necessary to attain compliance."  *M.M.*, 2020 WL 109229, at *10 (citing *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012)).  Juricich passively resisted when he refused to stop walking and otherwise ignored the instructions.

Juricich argues that Koehler and Lopez could have used less intrusive means by initiating a conversation with him first.  Juricich Partial MSJ 18.  There is a dispute over what Koehler said to Juricich, but even if nothing was said, the three wail sirens, pulling the marked cars to box Juricich in, and Koehler's hand gesture would have caused a reasonable person to stop.  Juricich did not.  Given his unreasonable reaction, the officers used a low level of force to make him stop.  "Officers [] need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

As discussed, Juricich "was subjected to only a low level of force, such that the Defendant did not bypass the number of less painful measures to control the situation that the Ninth Circuit observed in *Young*."  *Donovan*, 2015 WL 993324 at *6; *see Young*, 655 F.3d at 1166 (concluding that the defendant's use of intermediate force, pepper spray and multiple baton strikes, bypassed "the availability of other, less intrusive measures" and "ma[de] clear just how limited was the government's interest in the use of significant force").  Given that relatively low level of force, Koehler and Lopez's failure to use some hypothetical less intrusive means does not undermine a finding under the totality of the circumstances that they used objectively reasonable force.

### 3.    Weighing the Conflicting Interests

Ultimately, the severity of "the force which is applied must be balanced against the need for that force."  *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003); *Young*, 655 F.3d at 1166.  Considering the undisputed facts and taking disputed facts in light most favorable to Juricich, I find that the government's interest outweighs the nature and

quality of the intrusion.  The deputies reasonably could have believed that Juricich posed a danger to himself and others by refusing to comply with lawful orders on the side of a state highway.  The force that they used was not excessive and did not violate the Fourth Amendment.

Defendants' motion for summary judgment on the excessive force portion of Juricich's section 1983 claim is GRANTED.

### D.    Qualified Immunity

If the conclusions I have drawn above are wrong, and there is a genuine dispute about the reasonableness of their actions, Juricich's § 1983 claim would still fail because defendants are entitled to qualified immunity.  *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017).

Qualified immunity involves two questions: (1) whether the defendant violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation.  *Isayeva*, 872 F.3d at 945.  An officer may be denied qualified immunity at summary judgment in a section 1983 case "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Id.* (citation omitted); *see id.* at 950 (declining to reach the first prong of qualified immunity and finding it "sufficient for purposes of qualified immunity merely to conclude that no clearly established law was violated by Deputy Barry in connection with his use of a taser against the resisting Tereschenko")

To meet the "clearly established" requirement, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  This requires defining the right allegedly violated in a "particularized" sense that is "relevant" to the actual facts alleged.  *Id.* "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  "[T]his inquiry must be undertaken in light of the *specific context* of the case, not as a broad general proposition." *Hamby v. Hammond*, 821 F.3d 1085,

1091 (9th Cir. 2016) (emphasis in original) (internal quotation marks and citation omitted).

On summary judgment, the nonmoving party has the burden of showing a clearly established violation.  *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017).  Juricich cites *Thomas v. Dillard*, 818 F.3d 864 (9th Cir. 2016) as existing precedent that squarely governs this case.  Juricich Oppo. 21.

In *Thomas*, officer Dillard responded to a call to investigate a man pushing a woman in a public area on a college campus.  818 F.3d at 871.  There he found Thomas, a student at the college, who had been hanging out with and kissing his girlfriend.  *Id.*  Although Thomas was unarmed and had committed no act of domestic violence, the officer demanded that Thomas submit to a search for weapons, believing that police officers are free to conduct a *Terry* frisk whenever they are investigating a potential "domestic violence" incident, regardless of the specific circumstances of the call or the facts encountered at the scene.  *Id.*  When Thomas refused to be searched, Dillard tased him.  *Id.*  Thomas sued Dillard under 42 U.S.C. section 1983, asserting unlawful seizure and excessive force under the Fourth Amendment.  *Id.*

The district court denied Dillard qualified immunity on summary judgment and granted partial summary judgment to Thomas on the issue of liability.  On appeal, the Ninth Circuit framed the issue as follows:

> We address whether a law enforcement officer has reasonable suspicion to conduct a *Terry* frisk, searching a suspect for weapons, based solely on the perceived domestic violence nature of the investigation.  We hold that, although the domestic violence nature of a police investigation is a relevant consideration in assessing whether there is reason to believe a suspect is armed and dangerous, it is not alone sufficient to establish reasonable suspicion.  We therefore hold Dillard violated Thomas' Fourth Amendment rights against unreasonable seizure by detaining him for the purpose of performing a *Terry* frisk.  Because it was not clearly established at the time that the perceived domestic violence nature of an investigation was insufficient to establish reasonable suspicion, however, we hold Dillard is entitled to qualified immunity.

*Thomas*, 818 F.3d at 871.

Juricich cites *Thomas* to argue that the deputies' conduct in deciding to immediately handcuff him, by force if necessary, simply because they were investigating an alleged domestic violence incident, was already clearly established as unlawful.  Juricich Oppo. 21.  Put differently,

United States District Court
Northern District of California

1    it was clearly established that only a genuine immediate danger to officer safety permitted

2    handcuffing and other intrusive physical measures when merely initiating a *Terry* investigation

3    based on minimal reasonable suspicion.  *Id.*

4          *Thomas* is a *Terry* frisk case.  This is not; it is a case that started as an attempted *Terry* stop

5    and ended in an arrest for violating Penal Code section 148(a)(1).  In addition to being

6    contextually dissimilar, *Thomas* differs factually based on the suspect's behavior, who "had been

7    cooperative, aside from refusing to raise his hands, kneel, and be frisked," and "gave no indication

8    he was going to flee, and his resistance was mostly passive."  *Thomas*, 818 F.3d at 890.  Juricich

9    was not cooperative and ignored the officers while trying to walk past them after being advised

10   (by their conduct at least) to stop.  The distinctions from *Thomas* mean that Juricich has failed to

11   meet his burden of showing that the clearly established law prior to December 2018 "placed

12   beyond debate the unconstitutionality of the officials' actions, as those actions unfolded in the

13   specific context of the case at hand."  *Hamby*, 821 F.3d at 1091.  Accordingly, I find that the

14   defendants are entitled to qualified immunity.

15         Defendants' motion for summary judgment on the entirety of Juricich's section 1983 claim

16   is GRANTED.

17   **II.    STATE LAW CLAIMS**

18       **A.    California Civil Code section 52.1**

19         Juricich brings his second cause of action under section 52.1 of the California Civil Code,

20   also known as the Bane Act.  SAC ¶¶ 46–49.  The Bane Act creates a right of action against any

21   person who "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment by

22   any individual or individuals of rights secured by the Constitution or laws of the United States, or

23   . . . of this state."  Cal. Civ. Code § 52.1(a).  A Bane Act claim requires a showing of "specific

24   intent" on the part of the officer to violate the constitutional right at issue.  *Reese v. Cty. of*

25   *Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018) ("[T]he specific intent requirement . . . is

26   consistent with the language of Section 52.1, which requires interference with rights by 'threat,

27   intimidation or coercion,' words which connote an element of intent.");  *B.B. v. Cty. of Los*

28   *Angeles*, 25 Cal. App. 5th 115, 133 (2018) ("Like . . . *Reese*, we conclude that, to establish liability

United States District Court
Northern District of California

21

1    under the Bane Act, a plaintiff must prove the defendant acted with a specific intent to violate the

2    plaintiff's civil rights.").  "The act of interference with a constitutional right must itself be

3    deliberate or spiteful."  *Julian v. Mission Community Hospital*, 11 Cal. App. 5th 360, 395 (2017)

4    (citation omitted).

5           Based on the analysis above holding that Juricich did not suffer a deprivation of a

6    constitutional right under the Fourth Amendment, the claim under the Bane Act – requiring a

7    violation of a civil or constitutional right – cannot be maintained.  *See M.M.*, 2020 WL 109229, at

8    *12.  Defendants' motion for summary judgment on Juricich's second cause of action under the

9    Bane Act is GRANTED.

         **B.      Negligence**

11          Juricich sues defendants for negligence based on the same facts described above.  SAC ¶¶

12   50–58.  In California, police officers have a duty to act reasonably when using force.  *Hayes v.*

13   *County of San Diego*, 57 Cal.4th 622, 629 (2013).  Reasonableness of an officer's conduct is

14   determined under the totality of the circumstances.  *Id.*  This test is distinct from and broader than

15   the Fourth Amendment's reasonableness standard, which places less emphasis on pre-force

16   conduct.  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034–36 (9th Cir. 2018.)  Under state law,

17   negligent conduct by officers that provokes the situation that requires law enforcement to use force

18   can render otherwise reasonable use of force unreasonable.  *Hayes*, 57 Cal.4th at 629–30.

19          As discussed above, Koehler and Lopez's use of force was reasonable under the totality of

20   the circumstances.  There is no evidence that they negligently provoked Juricich into resisting a

21   lawful command.  Instead, the undisputed evidence shows that they attempted to get his attention

22   through three wail sirens, pulled a patrol car in front of him, and gestured to him to stop before

23   Juricich attempted to leave the scene in contravention of the obvious commands to stop.

24          Because Koehler and Lopez did not act negligently, vicarious liability against the County

25   and Sheriff's Office necessarily fails too.  To the extent that Juricich's negligence claim against

26   Brandt is based on a lack of reasonable suspicion to detain in the first place, the claim fails for the

27   same reasons set forth above.  Defendants' motion for summary judgment on Juricich's third

28   cause of action of negligence is GRANTED.

United States District Court
Northern District of California

C.      **Assault and Battery**

Juricich sues Koehler and Lopez for assault and battery under California law for using force against him.  SAC ¶¶ 59–64.  Claims for assault and battery arising out of the alleged use of unreasonable force by a police officer are analyzed under the same objective reasonableness standard as under the Fourth Amendment.  *Hernandez v. City of Pomona*, 46 Cal.4th 501, 514 (2009) ("California's civil jury instructions specifically direct the jury, in determining whether police officers used unreasonable force for purposes of tort liability, to consider the same factors that the high court has identified [for a section 1983 action]"); *Lopez v. City of Los Angeles*, 196 Cal. App. 4th 675, 685 (2011); *Hernandez v. City of Pomona*, 46 Cal.4th 501, 513–515 (2009); *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998) (battery by police officer requires showing unreasonable force was used).  Thus, Juricich's claim for assault and battery is analyzed under the same rubric as the Fourth Amendment.

In light of the Fourth Amendment analysis above concluding that Koehler and Lopez's actions were objectively reasonable and that they did not use excessive force, Juricich's claim for assault and battery must similarly be rejected.  Defendants' motion for summary judgment on Juricich's fourth cause of action of assault and fifth cause of action of battery is GRANTED.

## III.   ADA CLAIM

The Ninth Circuit has recognized two types of ADA claims applicable to arrests: (1) wrongful arrest, "where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity," and (2) reasonable accommodation, where police "fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds, City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015).  Juricich's ADA claim is based on Koehler and Lopez's alleged failure to reasonably accommodate his colostomy bag.  He seeks to hold the County and Sheriff's Office vicariously liable for the deputies' conduct. *See* SAC ¶¶ 65–78.[7]

---

[7] On April 22, 2020, Juricich voluntarily dismissed his ADA claim against Brandt.  Order of

1    Before a public entity can be required under the ADA to provide a disabled individual a

2    reasonable accommodation, "a public entity must have knowledge of the individual's disability

3    and the individual's need for an accommodation." *Robertson v. Las Animas Cty. Sherif's Dep't*,

4    500 F.3d 1185, 1196 (9th Cir. 2007).  "[T]he entity must have knowledge that the individual is

5    disabled, either because that disability is obvious or because the individual (or someone else) has

6    informed the entity of the disability." *Id.*

7    It is undisputed that Juricich's colostomy bag was not visible and obvious at the time of

8    arrest.  Lopez Dash-Cam Footage at 2:12–2:44.  Koehler and Lopez claim that they were not

9    aware of Juricich's colostomy bag prior to the arrest either.  After arrest, Lopez conducted a pat-

10   down search to make sure Juricich had no weapons; this is when he learned of the colostomy bag.

11   Lopez Dep. at 186:04–15, 187:06–22.  Accordingly, defendants argue that Juricich cannot

12   establish that Koehler and Lopez were aware of his colostomy bag before completing the arrest.

13   All Juricich offers with respect to Koehler and Lopez's pre-arrest knowledge is that Gore

14   told Brandt about the colostomy bag.  Juricich Oppo. 24.  Gore claims that when she saw "a

15   sheriff's car or SUV flying down the road past me," on the way to find Juricich, she told Brandt,

16   "He has a lifetime colostomy bag.  You guys need to be aware of that.  Please tell them."  Gore

17   Dep. at 85:2–3, 12–13.  She claims that Brandt responded, "I will make sure they know about

18   this," but she did not see him notify Koehler and Lopez.  *Id.* at 85:18–21.

19   Assuming that Gore's recollection is accurate, there is no way that she could have

20   completed the conversation she described in her deposition testimony and still provide Brandt with

21   a reasonable opportunity to convey Juricich's colostomy bag condition to Koehler and Lopez

22   before they engaged with Juricich.  Gore claims that she told Brandt about the colostomy bag as

23   she noticed a patrol vehicle driving past her.  The patrol vehicle did not pass Gore until around the

24   4:14 minute/second mark of Brandt's dash-cam footage.  Brandt Dash-Cam Footage at 4:13–4:15.

25   Koehler and Lopez encountered Juricich about a ten second drive from where Gore was initially

26   stopped.  Lopez's patrol vehicle roof lights were activated and visible in Brandt's dash-cam

Dismissal of Defendant David Brandt From the Sixth Cause of Action Only [Dkt. No. 31].

24

United States District Court
Northern District of California

1   footage when Gore ultimately pulled her vehicle further northbound on SR-82 to pull over safely

2   on the right shoulder.  Brandt Dash-Cam Footage at 6:45–7:10.

3         Juricich's disability was not obvious to Koehler and Lopez.  They were not informed of the

4   disability prior to the arrest.  Defendants' motion for summary judgment on Juricich's ADA claim

5   with respect to the lack of reasonable accommodation pre-arrest and during the arrest is

6   GRANTED.

7         Juricich separately argues that he was denied a reasonable accommodation post-arrest.

8   Defendants knew about Juricich's colostomy bag at that point.  However, the parties dispute

9   whether defendants knew that Juricich needed an accommodation for his colostomy bag post-

10  arrest, and whether the failure to reasonably accommodate caused Juricich to suffer greater injury

11  and indignity in that process than other arrestees.

12        Juricich says that he told Lopez on the side of the road after he was handcuffed that he

13  needed to re-attach his colostomy bag, but Lopez simply tucked it back into Juricich's pants

14  instead of letting him re-attach it himself.  Juricich Dep. at 176:12–14.  Lopez is seen adjusting

15  Juricich's pants in the dash-cam video.  Lopez Dash-Cam Footage at 3:13–3:28.  Juricich further

16  claims that he asked Koehler at the San Carlos substation if he could use the bathroom to take care

17  of his colostomy bag, but his request was denied.  Juricich Dep. at 177:16–17, 178:25–179:10.  He

18  was then moved to the Redwood City jail where he told a nurse about his colostomy bag, but his

19  request to use the bathroom to re-attach his colostomy bag was again denied.  *Id.* at 180:18–

20  181:15.  It was not until he was placed in a cell, with others, that he was unhandcuffed and able to

21  examine the damage and try to re-attach his colostomy bag in front of others, exposing his

22  abdomen and stoma.  *Id.* at 181:16– 182:23.

23        Juricich asserts that had Koehler and Lopez made even a minimal effort to accommodate

24  him and permit him to examine the damage either immediately after they seized him or in the San

25  Carlos substation, or in the Redwood City jail, then he would have asked to be taken to a hospital

26  to try to immediately repair the damage to the colostomy bag.  Juricich Oppo. 25.  At the hearing,

27  he argued that defendants' lack of post-arrest reasonable accommodation caused him damage in

28  the form of humiliation, indignity, and the extreme discomfort of having to stand in the jail cell for

United States District Court
Northern District of California

25

United States District Court
Northern District of California

1    several hours because he could not sit down with an unattached colostomy bag.

2    Defendants respond that Juricich never claimed that his colostomy bag came unattached or

3    that it needed to be adjusted.  Koehler Dep. at 166:12–18.  Koehler claims that he asked Juricich if

4    he had any injuries and he responded he did not; the only visible injury was a scratch on his check.

5    *Id.* at 166:25–167:04.  There is no report of injury by the jail nurse during the booking process,

6    other than an abrasion on the left elbow and a small cut or laceration on his right cheek.  Cruz

7    Decl., Ex. J (Correctional Health Services Questionnaire) at CSM 000029–34; *id.*, Ex. K (Meria

8    Dep.) at 46:18–19, 50:04–05, 63:15.  The jail nurse testifies that the Redwood City jail keeps

9    colostomy bags in stock in case someone needs to change their bag.  Meria Dep. at 37:20–23.

10    Given disputed questions of fact on what occurred after Juricich's arrest, defendants'

11    motion for summary judgment on the post-arrest portion of Juricich's ADA claim is DENIED.

## CONCLUSION

13    Defendants' motion for summary judgment on Juricich's first cause of action under section

14    1983 is GRANTED.  Juricich's cross motion for partial summary judgment regarding the

15    objective reasonableness of the deputies' actions is DENIED.

16    Defendants' motion for summary judgment on Juricich's related state law claims, the

17    second through fifth causes of action, is GRANTED.

18    Defendants' motion for summary judgment on Juricich's sixth cause of action under the

19    ADA is GRANTED with respect to defendants' conduct pre-arrest and during arrest but DENIED

20    with respect to defendants' post-arrest conduct given disputes of material fact.

21    **IT IS SO ORDERED.**

22    Dated: January 29, 2021

William H. Orrick
United States District Judge